# UNITED STATES DISTRICT COURT
## for the
### Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Apple iPhone<br>Seizure No. S001530121<br>(Target Device) | Case No.  '22 MJ1666 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the **Southern** District of **California**, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Secs. 841 and 846 | Distribution of Controlled Substances and Conspiracy to do the same |

The application is based on these facts:
See Attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Chris Ambrose*
Applicant's signature

Christopher Ambrose, DEA Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by **telephone** *(specify reliable electronic means)*.

Date: May 12, 2022

*Barbara L Major*
Judge's signature

City and state: San Diego, California     Hon. Barbara L. Major, United States Magistrate Judge
Printed name and title

# AFFIDAVIT

I, Special Agent Christopher Ambrose, being duly sworn, hereby state as follows:

## A. INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic device:

> Apple iPhone Cellular Phone
> Seizure No. S001530121
> (**Target Device**)

as further described in Attachment A, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 841(a)(1), 846, (Distribution of Controlled Substances and Conspiracy to do the same), as further described in Attachment B. The **Target Device** was used by Roberto Carlos RIOS and is currently in the custody of the Drug Enforcement Administration (DEA) located at 4560 Viewridge Ave, San Diego, California.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## B. TRAINING AND EXPERIENCE

3. I am a Special Agent of the Drug Enforcement Administration (DEA) and have been so employed since January 2019. I attended the DEA Academy in Quantico, VA for approximately 16 weeks. Currently, I am assigned to the San Diego Field Division (SDFD) Narcotic Task Force (NTF). Previously, I was employed as a Border Patrol Agent with the United States Border Patrol (USBP) for approximately 11 years. During my time as an agent with the Border Patrol, I was assigned as a Task Force Officer (TFO) for the DEA on an Organized Crime Drug Enforcement Task Force (OCDETF) for approximately two years

4.      During my tenure with DEA, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry and those who possesses and distribute narcotics within and throughout the United States.

5.      I am aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones and other portable electronic devices (such as Laptops, iPads, Tablets, etc.). A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles or on persons entering the United States at Ports of Entry such as the San Ysidro Port of Entry and the Otay Mesa Port of Entry. With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual(s) responsible for importing and/or transporting the concealed narcotics in the United States. These communications can occur before, during and after the narcotics are imported into the United States and transported therein. For example, prior to the importation, narcotics traffickers frequently communicate with the transporter(s) regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the transporter(s) to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with co-conspirators immediately prior to and following their illicit transactions to negotiate prices and quantities, coordinate meeting times and locations, discuss the transportation through checkpoints, and then to discuss future transactions or future payments if the narcotics were "fronted" (delivered without being paid for in advance).

6. Based upon my training and experience and consultations with law enforcement officers experienced in drug trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Narcotics traffickers will use cellular telephones because they are mobile, and they have instant access to telephone calls, text, web, and voice messages;

    b. Narcotics traffickers will use cellular telephones because they can actively monitor the progress of their illegal cargo while the conveyance is in transit;

    b. Narcotics traffickers and their accomplices will use cellular telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

    d. Narcotics traffickers will use cellular telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

    e. Narcotics traffickers will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings; and

    f. The use of cellular telephones by traffickers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

7. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a trafficker's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

8. Based upon my training, experience, and consultations with law enforcement officers experienced in controlled substances trafficking, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts,

3

voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the trafficking of controlled substances may yield evidence:

    a.    tending to indicate efforts to distribute controlled substances;

    b.    tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of controlled substances;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the distribution of controlled substances;

    d.    tending to identify travel to or presence at locations involved in the distribution of controlled substances, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications.

9. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of narcotics trafficking investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit.

### C.    FACTS SUPPORTING PROBABLE CAUSE

10. On or about March 30, 2022, investigators received information from a Source of Information (SOI)[1] indicating that defendant, Roberto Carlos RIOS, Jr., acts as a courier

---

[1] The SOI was recently arrested for alien smuggling, in violation of Title 8, U.S.C. § 1324. SOI has not been charged for the alien smuggling offense and has agreed to assist law enforcement in hopes of favorable consideration in future prosecutorial decisions. The SOI has no criminal convictions. Since the SOI has begun providing information to investigators, the SOI has provided information that has proven credible and reliable.

4

for a drug trafficking organization (DTO). The SOI also told investigators that RIOS uses a Corolla to transport narcotics north from the San Diego, California area for the DTO and identified RIOS through a photograph that investigators showed the SOI.

11. On or around May 5, 2022, investigators executed a warrant authorizing the installation and use of a tracking device on a 2019 Toyota Corolla, bearing California license plate 8JUX586, registered to RIOS at 1400 Elder Avenue San Diego, California. Later that day, the tracking device showed that the Corolla was moving northbound on Interstate 5 (I-5). Investigators then contacted the Oceanside Police Department (OPD) for assistance with an enforcement stop.

12. OPD Officers located the Corolla around northbound I-5 near Mission Avenue in Oceanside, California. Upon reaching the vicinity of the Corolla, the OPD Officers observed that the driver of the Corolla, later identified as RIOS, immediately rolled down the windows and hit the brakes, causing the Corolla to rapidly change from a high to a low rate of speed. Based on their training and experience, OPD Officers believed that, upon seeing the marked OPD vehicle, RIOS quickly rolled down the Corolla's windows because they were tinted in violation of the California Vehicle Code (CVC). OPD Officers initiated a traffic stop on the Corolla based on violations of CVC §§ 22350 – speeding, and 26708(a)(1) – driving with tinted windows. RIOS yielded approximately one mile north of Harbor Drive in San Diego, California.

13. OPD Officers approached the driver's-side window of the Corolla and encountered RIOS, who provided an expired California driver's license. During the traffic stop, a United States Border Patrol Agent (BPA) and his Narcotics and Human Detection Dog (NHDD) arrived at the scene. The NHDD conducted an exterior sniff of the vehicle and alerted to a trained odor. Based on the NHDD's alert, OPD Officers decided to conduct a physical search of the Corolla, but believed it would not be safe to search the Corolla at its location on the side of the freeway. Upon receiving RIOS's consent to move the Corolla to a safer location, OPD Officers moved the Corolla to the San Clemente Checkpoint to conduct the physical search.

14. During the search of the Corolla, OPD Officers found a black duffle bag and a multi-colored bag in the back seat that contained fourteen packages wrapped in black electrical tape. The packages weighed approximately 19.00 kilograms (41.88 pounds) and contained a white crystalline substance that tested positive for methamphetamine. Additionally, inside a bag attached to the headrest of the front passenger seat, OPD Officers found a handgun without a serial number, often referred to as a Polymer 80 handgun or "Ghost Gun." The handgun was loaded with eight 9mm rounds of live ammunition.

15. Roberto Carlos RIOS was placed under arrest and charged with violating Title 21, U.S.C., Section 841(a)(1), possession with intent to distribute methamphetamine. The **Target Device** was found in RIOS's car at the time of arrest. RIOS was shown the **Target Device** and identified it as his.

16. Based upon my experience and training, consultation with other law enforcement officers experienced in controlled substances trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Device**. In light of the above facts and my experience and training, there is probable cause to believe that RIOS was using the **Target Device** to communicate with known and unknown co-conspirators, and others, to further the transportation and distribution of illicit controlled substances within the United States. Further, in my training and experience, controlled substances traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the controlled substances. Based on my training and experience, it is also not unusual for individuals, such as RIOS, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks, months, or years longer than they claim. Accordingly, I request permission to search the

**Target Device** and seize the items listed in Attachment B from February 5, 2022, up to and including May 5, 2022.

### D. SEARCH METHODOLOGY

*Procedures for Electronically Stored Information*

17. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

18. Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

7

19. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

### E.  PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

20. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

### F. CONCLUSION

21. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Device** will yield evidence of RIOS's violations of Title 21, United States Code, Sections 841(a)(1), 846. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Chris Ambrose*
Special Agent Christopher Ambrose
Drug Enforcement Administration

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this  12th  day of May, 2022.

*Barbara L. Major*
HONORABLE BARBARA L. MAJOR
UNITED STATES MAGISTRATE JUDGE

9

# **ATTACHMENT A**
PROPERTY TO BE SEARCHED

The following property is to be searched:

> Apple iPhone
> Seizure No. S001530121
> (**Target Device**)

The **Target Device** is currently in the possession of the Drug Enforcement Administration (DEA) located at 4560 Viewridge Ave, San Diego, California 92123.

## **ATTACHMENT B**
ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Device** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, web history, files, metadata, photographs, audio files, videos, and location data, for the period of February 5, 2022, up to and including May 5, 2022:

a. tending to indicate efforts to distribute controlled substances;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution of controlled substances;

c. tending to identify co-conspirators, criminal associates, or others involved in the distribution of controlled substances;

d. tending to identify travel to or presence at locations involved in the distribution of controlled substances, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications;

which are evidence of violations of 21, U.S.C., §§ 841 and 846.